All right. So, councils, we're going to audience manner when you approach. Identify yourselves for the record and then what party you represent. Good morning. Mary Barron for Elion Nance. Your Honor, Margaret Smith, assistant chief attorney on behalf of Elion Nance. Okay. So then 15 minutes apiece and then somewhere above? Perfect. Okay. How much time do you want for above? Five minutes. Okay. And proceed. Good morning. May it please the Court. Once again, my name is Meredith Barron from the Office of the State Appellate Defender. Here today on behalf of my client, Elion Nance. Your Honors, it is undeniable that in the year and a half since Elion first filed his opening brief, it has become significantly more difficult for an emerging adult to establish cause when raising a proportionate penalties claim in a successive post-conviction petition. While the general legal landscape may have changed, what has not changed are the facts of Elion's case. What has not changed is that Elion was just 19 years old at the time of this offense. And when he was sentenced to a discretionary term of natural life imprisonment in 1994, not a single person at his sentencing hearing recognized the mitigating factors of his use. Not the state, not the court, and not even his own defense attorney. Nor did he receive any sort of pre-sentence evaluation by a mental health counselor or therapist or any sort of professional who could have attested to his immature brain development. So I don't mean to interrupt, but you do agree that it's not mandatory, right? Yes, it is not mandatory. It is discretionary at that time in 1991. Okay, great. Thank you. Proceed. And there was also no one, no one at his hearing recognized the special status of young adults like Elion as it relates to Illinois' proportionate penalty clause. So, in other words, Elion's record is completely devoid of the essential legal tools that he would have needed to raise this emerging adult proportionate penalties claim when he first filed his initial pro se post-conviction petition back in 1997. And so under his specific circumstances, he did establish cause. And he likewise established prejudice, as seen from Dr. James Barberino's 40-page report detailing the horrific circumstances of his childhood. He was subjected to developmentally damaging abuse and abandonment that rendered his brain akin to that of a juvenile. And had the court actually considered Elion's youth and its attendant characteristics, he would have received a lesser sentence. And so at this preliminary screening stage, Elion has more than adequately alleged sufficient facts and supporting documentation to make a primal fashion showing of cause and prejudice. So, but the judge's written ruling indicates that he did look at the youthfulness and he looked at other factors as well at the time. The circuit court's ruling? Yes. So the circuit court's ruling is incorrect. There is absolutely no mention anywhere in the sentencing hearing where the court recognizes age or youth. And the circuit court below entered an opinion to deny Elion Leaf. He denied Elion Leaf by making factual and credibility determinations that he is not allowed to do at this stage and also by finding things in the record that simply don't exist. He called it a Miller-compliant hearing and this was anything but a Miller-compliant hearing. Youth did not exist in this record. And so now the state disagrees with our position and they find that the Illinois Supreme Court decisions in Clark and Moore and Dorsey are dispositive. And since Moore did find that Miller does not provide cause for a young adult offender's proportionate penalties claim, Elion's argument likewise must now fail. But while these cases do present a new hurdle for establishing cause, they are not an absolute barrier. Now more specifically, Elion is raising an as-applied challenge. And by its very definition, an as-applied challenge relies on the particular facts and circumstances of an individual petitioner. And the facts of Dorsey, Clark, and Moore are clearly distinguishable. As all four of those defendants received substantial mental health evaluations prior to sentencing, often addressing characteristics that we now recognize to be the transient qualities of youth. And why didn't your client receive the same type of treatment or examination? I don't know why he didn't, but I know he didn't. And that's the exact thing that distinguishes, it's one of the things that distinguishes his case from Dorsey, who was a juvenile defendant and who received, at his sentencing hearing, there was a psychologist who analyzed his intellectual capacity, and there was a psychiatrist who analyzed his vulnerability to manipulation, exploitation. Elion didn't receive anything like that. In Clark, the 24-year-old defendant was actually evaluated by three psychologists and a psychiatrist, all of whom testified at his sentencing hearing about such diagnoses as borderline personality disorder and antisocial personality disorder. And even more significantly, in Clark, they testified specifically that he had the intellectual skills of a 13-year-old, the interpersonal skills of a 7-year-old, and the empathy of a 3-year-old. And similarly, in Moore, both defendants received mental health evaluations prior to sentencing that were submitted in sentencing. Defendant Williams, he had a PSI that included an evaluation from a psychologist who specifically concluded not only that he had depression and high levels of anxiety, but that he had impulsivity, which could cause him to react without regard for others. And Moore, not only did he have an anger counselor who testified that he had a history of physical abuse and that he had unresolved anger issues, they testified there was two instructors from prisoner education reform programs who testified specifically about Moore's potential for rehabilitation. And it's with that record in mind that the court in Moore found that those defendants did not establish cause. In fact, the court in Moore explicitly stated that the evidence and arguments raised at the sentencing hearings for both Moore and Williams shows that the parties knew in ignoring the law recognized the special status of young adults, especially those subject to adverse influences, for purposes of applying the principles of the proportionate penalties clause. And as a result, the court found that Moore and Williams had the essential legal tools to have raised their claims earlier. But Elion, on the other hand, he simply did not have those tools. He was never evaluated by a therapist or psychiatrist or psychologist, and there was likewise never any testimony or evidence introduced at his sentencing hearing showing that he was somehow less culpable because his brain was akin to that of a juvenile. And there is absolutely no indication that the parties or the court knew the special status of emerging adults like Elion as related to the proportionate penalties clause. And in fact, like you asked earlier, the circuit court is incorrect because his age and his youth was never considered in mitigation. And the only rehabilitative potential that was ever addressed by the parties and the court was that Elion was intelligent and he had people who loved him. And on this record, on Elion's record, he simply did not have the essential legal tools to have raised his emerging adult proportionate penalties claim when he filed his initial petition in 1997. After all, if not one legal professional knew to address the significance of youth as it relates to an emerging adult, how could Elion? How could 19-year-old Elion, who was being tried in adult court and sentenced as an adult, know to argue this issue when his record is completely devoid of his youth and its attendant characteristics? Well, he did have an assessment done by, what was his name, Dr. Garabino. But Dr. Garabino is who he had done now for his petition. Well, I want to address that for a moment because the state argues that it's a flawed assessment because all the information that he derived in terms of making the assessment was what he was provided by the defendant. Well, yes, and actually that gets into prejudice. And I would just say that he did establish cause. And moving into prejudice, like you asked, the state is incorrect. The idea that his report is rebutted by the record is just not correct. When you look at Dr. James Garabino's report, he is looking at Elion. He established all of these details about Elion that were just not included at the sentencing hearing. So, for example, Dr. Garabino concluded that Elion's sentence was developmentally inappropriate, relying on multiple traumatic experiences that he had in his youth and his adolescence, things that were never mentioned in sentencing, never mentioned at the hearing, things like the fact that Elion was drug dealing at age 8. He was sexually abused for more than a year when he was just 9 years old, and he joined the gangster disciples at 12. And specifically, I think one of the things that the state finds and the court below found to be contradicted is this idea that he told Dr. Garabino about his stepfather being repeatedly physically and emotionally abusive and that both his stepfather and his mother were drug addicts. But this is not something that was contradicted by the record. It's just something that was not previously disclosed at sentencing. And regardless of why he did not previously discuss his abusive stepfather or why he chose to not publicly reveal in court that his mother had a substance abuse problem, providing previously omitted information is not the same thing as a contradiction. So when you look at Dr. James Garabino's report, this is all brand new information about Elion that shows that his brain at 19, at the time of this offense, was akin to that of a juvenile. And since this is new information that is not provided by the record, the circuit court below was required to accept those allegations as true. But like I said, it didn't. It did exactly what it was not supposed to do, and it made factual and credibility determinations in order to deny Elion leave. I mentioned earlier about how they found it was middle-compliant. The circuit court below also found, quote, that Elion was clearly competent with a clearly high level of intelligence. But at this early pleading stage, petitioners do not need to establish cause and prejudice conclusively. And when you take Dr. Garabino's report as true, and the allegations in Elion's petition as true, he clearly established prejudice sufficient for granting leave to file. In closing, while the Post-Conviction Hearing Act generally contemplates the filing of just one petition, that statutory bar is relaxed when fundamental fairness so requires. And here, although 19-year-old Elion, his brain was akin to that of a juvenile, his youth was not even acknowledged, let alone considered, before the court imposed a sentence of natural life in prison. Moreover, as a result of Elion's specific circumstances, he did not have the essential legal tools to raise an emerging adult's proportionate penalties claim when he filed his initial post-conviction petition 27 years ago. Accordingly, Elion has established cause and prejudice, and he respectfully requests that this court reverse the circuit court's denial of leave to file and remand his petition for further post-conviction proceedings. Thank you. I have a question. So he was 19, but yet at the same time he participated in an act which required planning, right? Manipulation and thoughtfulness in terms of how it was going to be carried out. These definitely seem like actions of someone who does the work with thought to make a determination that, you know, what they were going to do on that particular day was going to terminate someone's life. And he participated in the planning and the execution of that offense. It doesn't sound like someone who is not thinking like an adult. And he was not thinking like an adult. I think your last line is exactly right. He was not thinking like an adult. And even if there's planning involved. What I meant was it doesn't seem like he was not thinking like an adult. He was actually thinking like an adult. Well, I mean, if you look at the other people that were with him, first of all, it was also a lot of the 13- and 14-year-olds who were doing the exact same thing that he was doing. I think we can all agree that those are juveniles. And the other thing is, though, right now we're still at the preliminary screening stage. And so at the preliminary screening stage, that's an issue for them to address later on. Right now we're not looking for relief. We're looking for the avenue to get us that relief, to get us in the door. And right now he just needs Dr. James Garbarino's report, which shows, because it's not contradicted by the record, that his brain was, in fact, like that of a juvenile at that time. Counsel, if I understand at least a portion of your argument when you mentioned Dorsey and cases of that ill. And how do we get around that? So that I understand your argument, how do we get around the fact that he's bringing these arguments now for the first time? It seems as though our Supreme Court has been fairly clear that because these apportionment penalties arguments could have been raised any time before now, how do we get around that element? So if you look at Moore, the line that I quoted earlier, that is, I think, the biggest distinction. It's that the court in Moore fully recognized that when you look at the record of the sentencing hearing for Moore and Williams, the two defendants in that case, it was clear from that record and the arguments and evidence at that sentencing hearing, both sentencing hearings, that the parties knew the special status of young adults at that time in relation to Illinois' apportionment penalties clause. And so that case, they had the essential legal tools, once again, to raise their issues earlier. But this is an as-applied challenge. And so on our record, unlike Moore, we have a different case with different facts and a different petitioner who did not have any reason to have raised this earlier. Well, one of the arguments they made with regard to the cause is that, and I think the language they used is tools. The tools to make these arguments were available to him at that time, yet he didn't utilize them. So how do you respond to that? So I think that the essential legal tools for us would be a record from which you could argue this. And so he's missing those essential legal tools. He's missing a record where he would say, oh, this is an issue I should have raised earlier. He didn't have a preset evaluation to show him that his mental health or his juvenile grade development was an issue. He didn't have any kind of evidence or testimony or the recognition from the court and the parties that the special status of an emerging adult as it relates to the apportionment penalties clause. And without that record, he is missing those essential legal tools. Any other questions? Thank you so much. We still have time for a vote. State. May it please the Court. I'm Assistant State's Attorney Margaret Smith representing the people of the State of Illinois. Defendant's claim fails because defendant did not make a showing of cause. Morris is positive in that recognizing that long before Miller, Illinois law recognized the special status of young adults for the purposes of applying the principles under the proportionate penalties clause. And here defendant had the necessary legal tools to raise the proportionate penalties claim when he filed his initial post-conviction petition in 1997. But they're arguing here that they didn't have the necessary tools. Well, they say the defendant did not have the necessary legal tools, which is what Moore said that the defendants did. The fact, though, is they then point to the fact that trying to distinguish Moore, Dorsey, and Clark by the fact that those defendants had mental health evaluations. But that's a factual distinction, and those would be, for lack of a better term, factual tools to support a legal argument. The fact is that the analysis in Moore, Dorsey, and Clark were not driven by the facts. And here, particularly, we're focusing on Moore since that is the case. So you don't think the evaluations that were performed? No, in all of those cases. Hold on. I'm sorry. So what you're saying is that the evaluations that were performed on the defendants in Moore and Dorsey are irrelevant? They don't really pertain to trial court's assessment in terms of what the sentence is going to be? Well, no. In those cases, there were reasons that those defendants had that. In Clark, the defendant always maintained that he had severe, severe mental health problems. That's not the case here. So we don't have something like that here that would have triggered a mental health evaluation. Also, in Dorsey, I believe it was he had probation that triggered an evaluation. We don't have that here. And in Moore, I believe it was, I'm sorry, I may be confusing. Moore had a transfer, the transfer, the juvenile transfer, so that triggered it. There were other factors that would have made it apparent there were some mental health concerns beyond just their home environment or their mental health issues, more like psychosis or those kinds of things. But we don't have that here. And the fact is, in all of those cases, the analysis was not driven by the facts, including the mental health evaluations, but by the law, the fact that the proportion of penalties claims were always available to those defendants. And that was here. I mean, would you agree that there are individuals that maybe are experiencing these conditions, but then don't outwardly exhibit them? So they're foreclosed from, you know, bringing that type of evidence before a trial court then, right? Yes, if I may. Defendant here never claims he had some severe mental health problem, say, like the defendant in Clark. Always maintained that. It was very clear, lots of severe mental health problems. Here, what Dr. Garabino looked at was the toxic family experiences. That was something the family environment was testified to at the sentencing hearing. We had four defendants' family members come and testify. His mother, his uncle who lived with him, his aunt and a family friend that he regarded as a grandma. It's not his mental health in terms of he had some psychosis or other severe mental health illness and whether or not he needed to be treated. That's very different. Here he's talking about the family environment and his ability to behave reliably. That's what he's trying to argue, and that's what he's arguing in Dr. Garabino's report, but also in the affidavit that the defendant himself and his brother bring forth. But the home environment and the environment in the greater neighborhood of the gangs, that was testified to at defendant's sentencing hearing. They just testified to completely contradictory facts. They were saying that defendant got straight, you know, great grades. He graduated from high school. He, in his free time, he went and helped his disabled mother take care of his other kid, her other children. He did get involved in the gangs. He did get sucked in by what his, I believe his aunt called the hellhole of the other environments. So it's not that there wasn't testimony regarding the things that defendant is now trying to bring forward, the type of home environment. The mom said he came home from school and helped me. I was disabled. He helped me with the siblings. Now it was apparently a drug-infested home that mom was dealing drugs out of and having him make drug deliveries. Completely contradictory testimony about the home environment. So it's not a matter of some severe psychological issue that just wasn't apparent. So they're not even arguing that. They're just giving a different picture of the home environment and the overall social environment. And then with Dr. Garibaldi, you know, the toxic family experience has damaged his ability to behave reliably in a pro-social manner as an adolescent. And a young adult. But that's totally contrary to what the defendant had the opportunity to bring at sentencing. And he had the opportunity and the legal tool to present a proportionate pedigree claim at any time. And at any time he had the opportunity to supplement the record with mitigating evidence of his traumatic childhood and the impact that it had on his behavior. But he didn't. Isn't that what Dr. Garibaldi is doing in his statements? That's what he's trying to do. But I would suggest that here it's misleading to suggest that a mental health evaluation is necessary to present the type of proportionate penalty claim that defendant wants to present. Defendant is now trying to present a claim of a toxic family environment that was influenced also with getting, he was abducted, he was shot at. He had the opportunity to present all of that evidence at sentencing. He presented evidence of his home environment with family members or about witnesses that came in and testified extensively. They just presented a completely contrary picture. He was a model student. He was a model son. He came home. He took care of his mother and his family. He was a competent, dependable, reliable young man. That is what the defendant had the opportunity to present and what he presented. He's always had the legal claim to bring a proportionate penalties claim. He always had the opportunity to supplement the record with any facts he wanted, including the type of facts he's bringing now, which are totally contrary to the record or positively rebutted by the record that he did choose to bring at sentencing. And he has, excuse me, at sentencing, and he has not taken advantage of the opportunity to supplement that. So here it is misleading to suggest that the defendant needed a mental health evaluation to present the type of facts he now says he needed to support the legal claim. But the fact also is the legal claim is really what matters here. That's what Ward tells us. The legal claim, the proportionate penalties claim, was always available to the defendant. It's not the facts about the mental health evaluation that the court relied on anymore. It's the fact that the essential legal tool, the fact of the Illinois proportionate penalties claim being available to the defendant. That's what's key and more. That is what is dispositive here. So was there an indication in the sentencing hearing that the court was even aware of special status for young emerging adults? Did that ever even come in in terms of the presentation to the trial court at sentencing? Yes. The court said the defendant was competent. He was intelligent, and he had the support of his family. He got good grades. He had a job at the post office. He had all of that, and he chose to throw it away and commit this horrendous crime. He chose, as you pointed out, Your Honor, that the defendant took part in an ambush. He planned an execution. The court knew that. And, in fact, I would argue the entire sentencing hearing, including what defense counsel argued, was all centered on whether a defendant was like a typical youth in that environment. And they argued he wasn't. He wasn't a member of the gang. That's what they said. The uncle had no idea. He said in his PSI he was a gang member, which is contrary to the evidence at the trial. But that's what defense had the opportunity to present, and they did. They said he wasn't involved in gangs. He got good grades. All of that. So defense counsel was trying to portray a defendant as a young man. He referred to him as a young man who was competent, dependable, reliable. Not like most. They didn't say that, but that was the entire premise was this was kind of an exceptional young man under those circumstances. And he has the support of his family. He has all these wonderful supportive things that give him potential for rehabilitation. Unlike most young men, young 19-year-old men, like that was the whole crux of the sentencing hearing. The people said, yeah, yes, he was exceptional. He was all of those things. But this person, he chose to throw it all away and planned and helped carry out an execution. And I think he pointed that out. He demonstrated maturity and competence and the opposite of an impulsive young man or young person in planning the crime here. And they were trying to argue at the defense was trying to argue that the crime itself was an aberration. They didn't even say it was impulsive. They were just saying it was an aberration. That's not really who this otherwise dependable, competent man who had the love and support of his family. That's not who he is. As to Dr. Rubino's report, the defendant had the opportunity to include this new evidence at the time of sentencing, and he chose not to. He chose to take advantage of that opportunity to supplement. I'm sorry. He took the opportunity to present the evidence that he was a dependable, reliable young man who helped his family, got the support of his family, didn't get involved in gangs, didn't even do drugs, much less sell drugs, that he was an exceptional young man. And he also had the opportunity to take advantage and supplement and support the claim he always had of proportionate penalties. He didn't take the opportunity at any time to supplement that claim with the facts he now tries to assert, which are positively rebutted by the facts that he did choose to present at sentencing, where he chose to argue that he was a competent, dependable, reliable young man. And defense counsel and the court both referred to him as a young man. Let me ask you a request. My request is for these reasons and those that are brief, respectfully request that this court dismiss this appeal. Thank you. Okay. Thank you. Thank you. Robyn. So I'd like to address a couple of points. First, the State argued that Moore was not driven by the facts of that case. But, again, the court more specifically stated that it was the evidence and the arguments, in other words, the facts that show that those parties knew the special status of young adults and that they, because of those arguments, because of that evidence, because of those facts, they had the essential legal tools. And I'd also like to say that the State's idea that the Dr. Barbarino report is contradicted by the testimony goes far beyond what something being contradicted stands for. The State argued that since Elion was helpful, because he took care of his disabled mother, because he loved his mother, that that is contradicted by Dr. Barbarino's report saying that he grew up in a drug house and that he had been physically abused and that he had these horrific things happen to him. But loving your mother, being a good son, being helpful when your disabled mother needs you, that is not mutually exclusive with being raised in a horrific home environment. So these things are not contradictions. And the fact that these were not addressed at sentencing does not mean that Dr. Barbarino's report is wrong. And it does not mean that it's now contradicted. It means that he is now providing helpful additional information, all of which goes to his conclusion that Elion's juvenile brain, his 19-year-old brain, was akin to that of a juvenile at the time of this offense. And based on what Dr. Barbarino found, which was not contradicted by facts in the record, and based on Elion's assertions, once again, at this preliminary screening stage, that is when we take these facts as true. And taking them as true, Elion showed prima facie cause and prejudice, and he should have been granted leave to file. I have a question. So basically what they're arguing is that it was strategic in terms of, okay, what kind of picture are we going to show to the sentencing judge in terms of the defendant? And they chose that he was an outstanding, law-abiding, hardworking individual and productive member of society. Now you're indicating that, you know, it's not anything that's contrary because of his environment and what happened when he was a youth. But it was, again, just a strategy that was employed by counsel at the time. So there were tools that are available. He just didn't exercise them usefully. Well, whether counsel decided to make him look like a good guy or not, I would argue that actually if you look at the sentencing hearing transcript, it's not quite as glowing as that. It does not show him in that light specifically. They do talk about the fact that he had some issues growing up in the area he grew up in. But the things that Dr. Garbarino reported on are not the things that were there. And if you look at this 1994 sentencing hearing, he didn't want to publicly say in court that his mother was a drug dealer. He didn't want to say these things in court. He may have known those facts about himself. He may have shown himself in a different light at sentencing. He didn't contradict those facts. A defense attorney might have done that. But even if he knew about these facts at the time, because nobody at that sentencing hearing, not the parties, not the court, nobody, unlike Moore, recognized the special status of emerging adults like Elion in relation to Illinois' proportionate counties clause. And since they did not know the special status of him being 19 with a juvenile brain, there was no reason for them to have raised it in that way at that time. But now that he's raising this to show under the Dr. Garbarino report, you know what, he had the brain of a juvenile. And as Dr. Garbarino said, a natural life imprisonment without recognizing that youth is developmentally inappropriate. And so if there are no further questions, then once again, we respectfully ask that this court reverse the circuit court's denial of leave to file and remand his petition for further post-conviction proceedings. Thank you.  All right. I want to thank counsels for a well-argued matter and a very interesting issue. We will take it under advisement. As I indicated earlier, Justice Lankin will be listening to the tapes and be participating in the decision in this cause. So with that, the court is adjourned.